2005 UT 81

Michael JENSEN, M.D., Plaintiff, Appellee, and Cross–Appellant,

v.

Mary SAWYERS and United Television, Inc., aka KTVX, Defendants, Appellants, and Cross–Appellees.

No. 20011023.

Supreme Court of Utah.

Nov. 15, 2005.

Rehearing Denied Jan. 18, 2006.

Dale F. Gardiner, Douglas J. Parry, Craig R. Kleinman, Salt Lake City, for plaintiff.

Robert M. Anderson, Jennifer Anderson Whitlock, Bradley M. Strassberg, Salt Lake City, and Thomas B. Kelley, Steven D. Zansberg, Denver, CO, for defendants.

NEHRING, Justice:

¶ 1 Defendants Mary Sawyers and United Television appeal a jury verdict that they defamed Dr. Michael Jensen, invaded his privacy, and intentionally interfered with his economic relations. Dr. Jensen cross-appeals the trial court's reduction of part of the damages award. He also cross-appeals the denial of attorney fees and denial of necessary disbursements as costs. We reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Geoff Goff, an executive producer for Channel 4, KTVX, in Salt Lake City, Utah, met Dr. Michael Jensen at a 1995 Fourth of July party given by a mutual friend, Ms. Johnson. Ms. Johnson, a restaurant critic, remarked to her cousin, Mr. Goff, and Dr. Jensen that she had to exercise all the time because her job required her to eat out so frequently. In response to her jocular comment, Dr. Jensen offered to prescribe her diet drugs—amphetamines—which he explained to Ms. Johnson were an easy and effective way to lose weight. Ms. Johnson did not express any interest in his offer. Dr. Jensen nevertheless persisted and wrote a prescription, giving it to Ms. Johnson. He did so without taking a medical history or making any appointment with her for a physical examination. Ms. Johnson told Dr. Jensen she was not interested in the prescription, but Dr. Jensen advised her to hold on to it, in case she wanted to fill it later. Mr. Goff testified that he found it "unusual" that a doctor would be handing out a prescription for amphetamines at a party with no knowledge of Ms. Johnson's medical history or background.

¶ 3 Later that evening, after Dr. Jensen had left the party, Mr. Goff and Ms. Johnson discussed the "unusual" interaction with the

physician. Both believed that Dr. Jensen may have acted unethically in providing a prescription for amphetamines to a patient he had not examined. Mr. Goff stated that "[a]t that point I began to feel that we ... had maybe a news story here." The following day, Mr. Goff met with KTVX news director John Edwards and recounted Dr. Jensen's statements made at the party. Mr. Goff "wrote up the facts as [he] knew them ... to give to Mary Sawyers [the station's medical issues reporter] so she could begin looking into the story."

¶ 4 Ms. Sawyers called Dr. Jensen and explained that her managing news editor at KTVX, Mr. Goff, had referred her to Dr. Jensen as someone who could help her lose weight. During the conversation, Ms. Sawyers explained that she was a reporter, but implied that she was calling Dr. Jensen as a prospective patient and not as a reporter. Ms. Sawyers told Dr. Jensen that she had "been on this diet lately and [had not] been able to lose much weight," so she asked if he could prescribe diet pills for her. He replied that "yeah, [he] probably could." Dr. Jensen told her that he would need to see her in person to prescribe diet pills. He also relayed that "I'm the guy to talk about weight loss ... many physicians are reluctant to prescribe prescription diet pills. I really am not." Dr. Jensen told her that he prescribed Fastin and Pondimin, but that "[t]raditionally what has been used is Dexedrine. Dexedrine is technically illegal to ... use as a diet pill. Though I ... sometimes find people have other disorders that I ... feel comfortable using Dexedrine with."

¶ 5 Ms. Sawyers found Dr. Jensen's admission that he found ways to prescribe Dexedrine as a diet drug "out of the ordinary" and, based on her further research about state laws relating to prescribing drugs, likely illegal. As a result, Ms. Sawyers decided to further pursue the story, concluding that it was "an issue of vital public interest."

¶ 6 Ms. Sawyers, Mr. Goff, and Mr. Edwards decided that Ms. Sawyers would pose as a patient and visit Dr. Jensen. She would record her visit with a hidden camera. The three believed that this plan provided the best way to obtain candid information from Dr. Jensen about his weight loss treatment practices.

¶ 7 Ms. Sawyers scheduled a face-to-face appointment with Dr. Jensen. Ms. Sawyers met with Dr. Jensen in an examination room at the Columbia FirstMed Clinic in Orem, Utah. Ms. Sawyers explained that she was there to obtain the "safest, easiest way to lose weight." Dr. Jensen explained that Fastin and Pondimin were, at that time, the most commonly prescribed medications for weight loss. He added that "[i]f Fastin didn't work for you, I would be willing to work with you ... maybe using Dexedrine," but repeated his earlier comment that prescribing Dexedrine for weight loss was illegal. Dr. Jensen advised Ms. Sawyers that if she felt her Fastin was wearing off and needed something to pick her up, she could "take a small amount of the capsule and bite it" as a means of "breaking the time release form" of the drug, although doing so is considered a misuse of that drug.

¶ 8 During the appointment, Dr. Jensen did not obtain a complete medical history of Ms. Sawyers. He did not conduct a physical examination. He did not ask her if she was then taking any medication. Dr. Jensen's nurse took Ms. Sawyers' vital signs and asked if she was allergic to any medicines. Ms. Sawyers was not overweight or obese, and she was not weighed by Dr. Jensen or his staff.

¶ 9 Approximately one month later, Ms. Sawyers met with David Robinson, the director of Utah's Division of Occupational and Professional Licensing ("DOPL"). Ms. Sawyers showed Mr. Robinson the video tape of her appointment with Dr. Jensen. After viewing the tape, Mr. Robinson expressed his concerns about Dr. Jensen's interactions with Ms. Sawyers, stating that "I think when you look at the intent of the physician, it's clear that he knows that he is violating the law and is offering excuses for it. And I think he is doing so with potential jeopardy to his patients.... I'm very concerned about it."

¶ 10 After meeting with Mr. Robinson, Ms. Sawyers arranged a second meeting with Dr. Jensen. She told him that she wanted to interview him and that she intended to pres-

ent a very positive view of diet pills and that she was generally going to talk about the positive effects of diet pills. Dr. Jensen consented to the interview, and the two met at his office at Columbia FirstMed.

¶ 11 Ms. Sawyers began the second meeting by confronting Dr. Jensen with the statements about diet drugs he had made when the two had met previously. In response to his earlier remarks to Ms. Sawyers about Dexedrine, Dr. Jensen told Ms. Sawyers that he had contacted a few pharmacists and DOPL to obtain the rules and regulations for drug prescriptions. He told her that he was no longer able to "work with" her to obtain Dexedrine for weight loss.

### The First Broadcast

¶ 12 On September 5, 1995, Channel 4, KTVX, and Ms. Sawyers aired the first report about Dr. Jensen.[1] The report featured what it labeled "miracle diet pills" and asked "are doctors prescribing these pills too freely?" Ms. Sawyers told viewers that Dr. Jensen prescribed weight loss medications to her without examining her or asking if she had high blood pressure or diabetes, conditions which could be aggravated by the drugs Fastin and Pondimin. The broadcast also showed the hidden camera footage of Dr. Jensen admitting to Ms. Sawyers that he would be "willing to work" with her using Dexedrine, even though it was "technically not legal for that reason." The report concluded by showing a portion of Ms. Sawyers' interview with Mr. Robinson at DOPL. Mr. Robinson was shown telling Ms. Sawyers that the division was "very interested in" looking into Dr. Jensen's license. Ms. Sawyers told viewers that the "State Division of Licensing and the Federal Drug Enforcement Agency [have] both opened investigations into Dr. Jensen's prescribing practices."

¶ 13 The next day, Columbia FirstMed terminated Dr. Jensen's employment and Mountain View Hospital in Utah County revoked Dr. Jensen's privileges to practice medicine there. In addition, IHC Health Plans removed Dr. Jensen from its insurance panel due to his "unprofessional" and "possibly illegal" conduct that it believed had been disclosed in the September 5 KTVX broadcast.

### The Second Broadcast

¶ 14 Nine months later, DOPL filed a petition against Dr. Jensen. The petition alleged that Dr. Jensen's treatment of Ms. Sawyers violated Utah Administrative Code rule 156–37–11(14)(a) and (b),[2] and that Dr. Jensen had engaged in unprofessional conduct in violation of Utah Code section 58–1–501(2)(a), (b), and (g).[3] KTVX and Ms. Sawyers aired their second report about Dr. Jensen that same day, July 17, 1996.

¶ 15 The second news broadcast told viewers that DOPL had filed a petition for unprofessional conduct against Dr. Jensen. The second broadcast also reviewed the assertion made in the first, specifically, that Dr. Jensen had offered to "work with" Ms. Sawyers on illegally prescribing her Dexedrine.

¶ 16 Later that year, Dr. Jensen settled the DOPL complaint. He admitted that he had "failed to comply with some of the requirements" of Utah's Controlled Substance Rules. Dr. Jensen agreed to a public reprimand, to meet quarterly with professional licensing board members for one year, and to complete courses on proper prescribing practices and medical ethics.

### The Third Broadcast

¶ 17 KTVX aired a third broadcast on November 6, 1996. This broadcast highlighted problems with "questionable doctors" in Utah and gave viewers instructions to find

---

1. For convenience, this report will be referred to as the September 5 report or the first broadcast.

2. These rules address unprofessional conduct in prescribing, dispensing, and administering controlled schedule III or IV drugs for the purpose of weight reduction.

3. Section 58–1–501 defines unlawful and unprofessional conduct. Sections 2(a) and 2(b) pro-

hibit aiding or abetting any other person to violate any law or professional/ethical standard, such as explaining to Ms. Sawyers how to abuse Fastin. Section 2(g) relates to practicing a profession through gross incompetence, gross negligence, or a pattern of incompetency or negligence. Utah Code Ann. § 58–1–501(2)(a)–(b), (g) (1994).

out which Utah doctors had been disciplined or who had received complaints for unprofessional conduct. The broadcast named three physicians who had been censured, including one physician who stood accused of sexually abusing a patient and another of performing illegal abortions. Then Ms. Sawyers asked viewers, "And what about Dr. Michael Jensen? In July 1995, we caught him on camera promising me illegal drugs for weight loss." She said that

> action has now been taken against Dr. Michael Jensen. He's the one we caught on tape promising me illegal drugs. The state will allow Jensen to keep his license but he'll receive a public reprimand which requires him to attend a workshop on proper prescribing and a course on medical ethics.

### Procedural History of the Lawsuit

¶ 18 After the third broadcast, Dr. Jensen filed suit against Ms. Sawyers and KTVX ("defendants"). He sought relief under five causes of action: fraud and misrepresentation, intentional interference with prospective economic relations, negligent misrepresentation, defamation of character, and negligence. Defendants moved for summary judgment to dismiss Dr. Jensen's claims of fraud and negligent misrepresentation. They also sought summary judgment on Dr. Jensen's defamation claims relating to the first and second broadcasts, alleging they were barred by the one-year statute of limitations. *See* Utah Code Ann. § 78–12–29(4).

¶ 19 Dr. Jensen responded to the statute of limitations defenses by seeking to amend his complaint to add four additional claims that would be immune to limitation challenges: (1) invasion of privacy/intrusion upon seclusion; (2) violation of state; (3) federal wiretapping laws; and (4) false light invasion of privacy.

¶ 20 The trial court granted defendants' summary judgment motion on the claims of fraud and negligent misrepresentation and on the claim of defamation as to the first and second broadcasts, but also permitted Dr. Jensen to amend his complaint.

¶ 21 Defendants then brought a second round of motions seeking dismissal of the amended claims. Of the many contentions advanced in these motions only one is relevant to this appeal: that the one-year statute of limitations for defamation should apply to Dr. Jensen's false light invasion of privacy claim. The trial court denied that motion, and the case went to trial.

¶ 22 The jury returned a verdict for Dr. Jensen for false light invasion of privacy on the first and second broadcasts and awarded him $520,000 in economic damages, $85,000 in general damages, and $245,300 in punitive damages. Ruling separately on the third broadcast, the jury also returned a verdict for Dr. Jensen for false light invasion of privacy and defamation and awarded Dr. Jensen $1 million for economic loss, $500,000 in general damages, and $450,600 in punitive damages. The jury also found for Dr. Jensen on his common law intrusion on seclusion and violation of privacy claims and awarded him $90,000. Last, the jury found for Dr. Jensen on his tortious interference claim and awarded him $25,000 in general damages and $25,000 in punitive damages.

¶ 23 The trial court granted defendants' motion to alter the judgment, finding that the jury's award of damages for common law intrusion on seclusion duplicated the award for statutory violations, and reduced the three awards by $180,000 to a single award of $90,000.

¶ 24 Ms. Sawyers and KTVX appealed. They attribute multiple errors to the trial court. First, they assert that the one-year statute of limitations that barred Dr. Jensen's defamation claims based on the first and second broadcasts should also bar his false light invasion of privacy claims.

¶ 25 Next, they challenge the jury's false light invasion of privacy verdict stemming from the third broadcast on the grounds that all of the information disclosed in the third broadcast concerned Dr. Jensen's professional affairs and was, therefore, not actionable as an invasion of privacy.

¶ 26 For similar reasons, defendants take issue with the verdict awarding Dr. Jensen damages for intrusion on seclusion and violations of Utah privacy protection statutes, insisting that Ms. Sawyers' surreptitious taping

of Dr. Jensen did not take place under circumstances that amounted to an invasion of Dr. Jensen's privacy.

¶ 27 Fourth, defendants challenge the defamation verdict for Dr. Jensen on the third broadcast because its contents were substantially true.

¶ 28 Fifth, defendants challenge the sufficiency of the evidence supporting the jury's award of economic damages tied to the third broadcast.

¶ 29 Last, defendants claim that insufficient evidence exists to sustain the jury's punitive damages award.

¶ 30 For his part, Dr. Jensen cross-appeals four issues. We will address three of his claims: that the court was too restrictive in awarding him attorney fees, that he should be awarded all of his claimed costs because of rule 54(d)(2), and that his costs were "necessary disbursements." His fourth cross-appeal on reduction of damages is absorbed in our section focusing on the common law seclusion claim.

## ANALYSIS

### I. FALSE LIGHT INVASION OF PRIVACY AND DEFAMATION SHARE THE SAME STATUTE OF LIMITATIONS

¶ 31 We first take up defendants' claim that Dr. Jensen's recovery for false light invasion of privacy based on the first two broadcasts must be vacated because the one-year statute of limitations for defamation[4] governs claims for false light invasion of privacy, and Dr. Jensen filed his complaint

more than one year after the broadcasts aired. The trial court ruled as a matter of law that the tort of defamation was sufficiently different from false light invasion of privacy to place it beyond the reach of defamation's statute of limitations. The trial court reasoned that since no statute of limitations expressly applies to invasion of privacy torts, Dr. Jensen's false light invasion of privacy claim fell within the ambit of Utah's four-year "catch-all" statute of limitations "for relief not otherwise provided for by law." Utah Code Ann. § 78-12-25(3) (2000).[5]

¶ 32 We now assess anew the legal question of whether false light invasion of privacy enjoys a degree of kinship with defamation so close as to warrant a sharing of limitations periods. This undertaking of legal taxonomy requires that we examine the features of both torts to identify what characteristics, if any, they have in common. We must assess the relationship between the two claims in the context of the text and purpose of section 78-12-25(3).

¶ 33 We begin with an examination of the relevant statutory provisions. The legislature has assigned a one-year limitations period to actions for libel and slander.[6] Utah Code Ann. § 78-12-29(4). The United States District Court for Utah has predicted that we could rule that this one-year limitations period applies to defamation actions. *Watkins v. Gen. Refractories Co.*, 805 F.Supp. 911, 917 (D.Utah 1992). Today we confirm the accuracy of this prediction. The second relevant statute is Utah's "catch-all" provision which establishes a four-year limitations period "for relief not otherwise pro-

4. Utah Code section 78-12-29(4) states that "[a]n action may be brought within one year ... for libel, slander, [or] assault." Utah Code Ann. § 78-12-29(4) (2000).

5. The trial court made its affirmative ruling that Dr. Jensen's false light invasion of privacy claims were not time-barred in the context of denying defendants' motion for summary judgment seeking dismissal of the claims on statute of limitations grounds. Dr. Jensen contends that this issue was not preserved for appeal because, presumably, defendants did not reassert their statute of limitations claim at trial. To do so would have been futile. The fashion in which the trial court chose to deny defendants' summary judgment motion left nothing regarding the statute of

limitations to be decided at trial. The trial court ruling, which established the law of the case on the question of the applicable statute of limitations, was therefore preserved.

6. Slander and libel are a subset of defamation. "Slander consists of the publication of defamatory matter by spoken words, transitory gestures or by any form of communication other than [libel]." Restatement (Second) of Torts § 568(2) (1977). "Libel consists of the publication of defamatory matter by written or printed words ... in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words." *Id.* § 568(1).

vided for by law." Utah Code Ann. § 78–12–25(3).

■ ¶ 34 In assessing which of these two statutory provisions applies to Dr. Jensen's false light invasion of privacy claims, we pay little heed to the labels placed on a particular claim, favoring instead an evaluation based on the essence and substance of the claim. *See Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 14 (Utah 1990) (noting that whether a claim exists should be based on the "nature of the action and not the pleading labels chosen"). Applying this approach to Dr. Jensen's claims, we hold that they are properly classified as defamation claims and thus fall within the one-year limitation imposed by section 78–12–29.

■ ¶ 35 Defamation is the act of harming the reputation of another by making a false statement to a third person. *See West v. Thomson Newspapers*, 872 P.2d 999, 1007 (Utah 1994) ("To state a claim for defamation, [one] must show that defendants published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage."). This is what Dr. Jensen said defendants did to him in his initial complaint. When the trial court dismissed his defamation claims on the first and second broadcasts because they were filed too late, Dr. Jensen amended his complaint to frame defendants' alleged misdeeds as false light invasion of privacy. The conduct Dr. Jensen complained of under this theory was the same, only the legal grounds for his grievances were different. We now turn to an examination of Dr. Jensen's alternative legal grounds for relief: false light invasion of privacy.

¶ 36 American jurisprudence has long recognized the tort of invasion of privacy. *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68 (1905); *see also* Ken Gormley, *One Hundred Years of Privacy*, 1992 Wis. L.Rev. 1335, 1353 (1992) (listing the first invasion of privacy cases: "*Marks v. Jaffa*, 26 N.Y. Sup.Ct. 908 (1893) (publishing of picture of an actor, without consent, in newspaper popularity contest enjoined);

*Mackenzie v. Soden Mineral Springs Co.*, 18 N.Y.S. 240 (Sup.Ct.1891) (use of physician's name in advertising medicine, without consent); *Corliss v. E.W. Walker Co.*, 64 F. 280 (C.C.D.Mass.1894) (publishing biography and portrait of George H. Corliss, deceased inventor, not an invasion of privacy because he was a public figure; [the] opinion may be read to suggest, however, that right to privacy exists)"). The genesis of the tort of invasion of privacy in the United States is generally traced to an 1890 law review article authored by law partners Samuel D. Warren and Louis D. Brandeis in *The Right to Privacy*, 4 Harv. L.Rev. 193 (1890).

. ¶ 37 The jury returned a verdict finding both KTVX and Ms. Sawyers liable under multiple claims. Based on its findings of liability, the jury awarded Dr. Jensen general damages, damages for economic loss, and punitive damages. The trial court entered a seven-page, thirty-paragraph judgment detailing the various damages awards and their allocations. We will undertake to summarize the damages awards in a condensed form that includes only the damages awards subject to the challenges raised in this appeal. We will not describe the allocations of the various awards between Ms. Sawyers and KTVX as only the aggregate damages awards are affected by our rulings.

¶ 38 The jury was asked to consider separately Dr. Jensen's false light invasion of privacy claims arising from the combined first and second broadcasts and those linked to the third broadcast. This organizational scheme permitted the jury to consider separately Dr. Jensen's defamation claim tied to the third broadcast, a claim that unlike his defamation claims associated with the first and second broadcasts, had not been extinguished by the statute of limitations.

¶ 39 The jury awarded Dr. Jensen economic loss damages totaling $600,000, general damages of $100,000, and punitive damages of $245,300 based on defendants' liability for false light invasion of privacy on the first and second broadcasts.

¶ 40 Defendants' liability for defamation and false light invasion of privacy arising from the third broadcast resulted in an

award of economic loss damages of $1 million, general damages of $500,000, and punitive damages of $450,600.

¶ 41 The jury awarded Dr. Jensen $50,000 in general damages and $40,000 in punitive damages arising from defendants' liability under common law intrusion upon seclusion. The jury awarded a like $90,000 aggregate sum to Dr. Jensen on each of two of the three state statutory claims.

¶ 42 The trial court supplemented its judgment with an award of costs to Dr. Jensen totaling $7,412.46, and attorney fees in the amount of $75,058.50.

¶ 43 In 1960, Dean Prosser surveyed the invasion of privacy landscape and could not identify an internally consistent or coherent formulation of privacy based torts. He summarized the state of the privacy tort law this way:

> What has emerged from the decisions is no simple matter. It is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff, in the phrase coined by Judge Cooley, "to be let alone." Without any attempt to exact definition, these four torts may be described as follows:
>
> 1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
>
> 2. Public disclosure of embarrassing private facts about the plaintiff.
>
> 3. Publicity which places the plaintiff in a false light in the public eye.
>
> 4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.
>
> It should be obvious at once that these four types of invasion may be subject, in some respects at least, to different rules; and that when what is said as to any one of them is carried over to another, it may not be at all applicable, and confusion may follow.

*Sullivan v. Pulitzer Broad. Co.*, 709 S.W.2d 475, 477 (Mo.1986) (quoting Prosser, *Privacy*, 48 Cal. L.Rev. 382, 389 (1960)).

¶ 44 The second restatement of torts modified its approach to invasion of privacy to accommodate Dean Prosser's critique and proposed reforms. We, in turn, have fashioned our invasion of privacy jurisprudence around the second restatement. *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 906–07 (Utah 1992).

¶ 45 False light invasion of privacy entered English common law by an aggrieved Lord Byron. Protective of his reputation as a poet—his reputation for his nonpoetic behavior was controversial and, to many, beyond redemption—Byron successfully appealed to the British courts to stay publication of a "spurious and inferior poem attributed to him." Prosser, *supra* ¶ 43, at 398 (citing *Lord Byron v. Johnston*, 2 Mer. 29, 35 Eng. Rep. 851 (1816)). Although Byron's grievance sprang from his concern for his literary reputation, false light invasion of privacy does not necessarily provide redress for injury to a person's reputation. Instead, like each of the varieties of invasion of privacy, it owes its existence to the value society places on the right to be left alone. As we noted in *Russell*, it is because false light invasion of privacy protects a different interest than defamation that we have granted it status as an independent tort. 842 P.2d at 907. As we will discuss shortly, the difference in the interests protected by the two torts is an insufficient reason, particularly under the facts of this case, to justify the application of a separate statute of limitations to defamation and false light invasion of privacy.

¶ 46 An actionable portrayal of a person in a false light may or may not include the communication of defamatory information about the victim. As the examples in the Restatement illustrate, a person may conceivably be placed in a false light through the dissemination of praiseworthy but untrue information about that person, if a reasonable person would find the information highly objectionable. Restatement (Second) of Torts § 652E, illus. 9 (1977); *see also* Gary T. Schwartz, *Explaining and Justifying a Limited Tort of False Light Invasion of Privacy*,

41 Case W. Res. 885, 896 (1991) (reasoning that where nondisparaging false statements are disseminated about a person, "unless nondisparaging false statements actually rise to the level of highly offensive, the harm they bring about may not be substantial enough to justify all the costs involved in the recognition and administration of a false light tort" and advancing this contention, among others, to support his conclusion that false light as a distinct tort claim should be "significantly narrowed").

¶ 47 Whether false light invasion of privacy should maintain its place within the invasion of privacy canon is a question that has stimulated spirited debate among courts and commentators. As of 2002, "thirty state courts acknowledge false light as a viable claim in their jurisdictions." [7] *Denver Publ'g Co. v. Bueno,* 54 P.3d 893, 897 (2002) (citing in part *Bueno v. Denver Publ'g Co.,* 32 P.3d 491, 495 (Colo.Ct.App.2000)). Several states have either rejected the cause of action entirely or have not reached the issue because the facts of the case did not merit a review of false light invasion of privacy. *Id.* Twelve states have declined invitations to expressly welcome false light to join their invasion of privacy jurisprudence. *Id.; see also Cain v. Hearst Corp.,* 878 S.W.2d 577, 586 (Tex.1994).

The Colorado Supreme Court aptly characterized false light invasion of privacy as " 'the least-recognized and most controversial aspect of invasion of privacy.' " *Denver Publ'g Co.,* 54 P.3d at 897 (quoting *Cain,* 878 S.W.2d at 579). In doing so, the Colorado court also referenced various authorities' contentions that false light invasion of privacy's position as a distinct tort claim is tenuous at best. *Id.* at 898.

¶ 48 Critics of false light invasion of privacy point to its substantial areas of overlap with defamation as a sound reason not to legitimize it. *See, e.g.,* Schwartz, *supra* ¶ 46, at 887 (reasoning that a "false [light] statement disparages the plaintiff's conduct or character. If it is disparaging, however, the plaintiff evidently has a defamation action against the defendant").

¶ 49 Both defamation and false light invasion of privacy provide legal redress for uninvited notoriety grounded in falsehoods caused by the defendant. Despite certain dissimilarities between defamation and false light invasion of privacy, such as the requirement that false information be publicized more widely to be actionable under false light invasion of privacy than is necessary to sustain an action in defamation,[8] and the possi-

---

**7.** *Doe v. Roe,* 638 So.2d 826 (Ala.1994); *Godbehere v. Phoenix Newspapers, Inc.,* 162 Ariz. 335, 783 P.2d 781 (1989); *Dodrill v. Ark. Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840 (1979), cert. denied sub nom. *Little Rock Newspapers, Inc. v. Dodrill,* 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1980); *Fellows v. Nat'l Enquirer, Inc.,* 42 Cal.3d 234, 228 Cal.Rptr. 215, 721 P.2d 97 (1986); *Goodrich v. Waterbury Republican–Am., Inc.,* 188 Conn. 107, 448 A.2d 1317 (1982); *Barbieri v. News–Journal Co.,* 189 A.2d 773 (Del. 1963); *Agency for Health Care Admin. v. Assoc. Indus. of Fla., Inc.,* 678 So.2d 1239 (Fla.1996); *Cabaniss v. Hipsley,* 114 Ga.App. 367, 151 S.E.2d 496 (1966); *Hoskins v. Howard,* 132 Idaho 311, 971 P.2d 1135 (1998); *Lovgren v. Citizens First Nat'l Bank,* 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987 (1989); *Winegard v. Larsen,* 260 N.W.2d 816 (Iowa 1977); *Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1 (1975); *McCall v. Courier–Journal & Louisville Times Co.,* 623 S.W.2d 882 (Ky.1981), cert. denied, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982); *Perere v. Louisiana Tel. Broad. Corp.,* 721 So.2d 1075 (La. Ct.App.1998); *Nelson v. Maine Times,* 373 A.2d 1221, 1223 (Me.1977); *Harnish v. Herald–Mail Co.,* 264 Md. 326, 286 A.2d 146 (1972); *Deitz v. Wometco W. Mich. TV,* 160 Mich.App. 367, 407 N.W.2d 649 (1987); *Bd. of Dentistry v. Kandari-*

*an,* 268 Mont. 408, 886 P.2d 954 (1994); *Turner v. Welliver,* 226 Neb. 275, 411 N.W.2d 298 (1987) (citing false light invasion of privacy as codified in Neb.Rev.Stat. § 20–204 (1983)); *Romaine v. Kallinger,* 109 N.J. 282, 537 A.2d 284 (1988); *Moore v. Sun Publ'g Corp.,* 118 N.M. 375, 881 P.2d 735 (1994), cert. denied, 118 N.M. 430, 882 P.2d 21 (1994); *McCormack v. Okla. Publ'g Co.,* 613 P.2d 737 (Okla.1980); *Dean v. Guard Publ'g Co.,* 73 Or.App. 656, 699 P.2d 1158 (1985); *Larsen v. Philadelphia Newspapers, Inc.,* 375 Pa.Super. 66, 543 A.2d 1181 (Pa.Super.Ct.1988); *Montgomery Ward v. Shope,* 286 N.W.2d 806 (S.D.1979); *West v. Media Gen. Convergence, Inc.,* 53 S.W.3d 640 (Tenn.2001); *Russell v. Thomson Newspapers, Inc.,* 842 P.2d 896 (Utah 1992); *Lemnah v. Am. Breeders Serv., Inc.,* 144 Vt. 568, 482 A.2d 700 (1984); *Eastwood v. Cascade Broad. Co.,* 106 Wash.2d 466, 722 P.2d 1295 (1986); *Crump v. Beckley Newspapers, Inc.,* 173 W.Va. 699, 320 S.E.2d 70 (1983).

**8.** *Brauer v. Globe Newspaper Corp.,* 351 Mass. 53, 217 N.E.2d 736 (1966) (holding that publication to *one person* is sufficient to maintain action for defamation). *But see Russell,* 842 P.2d at 907 (requiring that a false light invasion of privacy claim center on " '[o]ne who gives publicity to a

bility that highly offensive but nondefamatory statements could provide adequate grounds for a claim of false light invasion of privacy, false light invasion of privacy and defamation have much in common. The differences between the two claims are at their margins. It is important to note, however, that Dr. Jensen's claims do not occupy these margins. The operative facts of his false light invasion of privacy claims allege defamation. In fact, they are the same facts he pleaded under his defamation causes of action that were dismissed as untimely.

¶ 50 Defamation claims always reside in the shadow of the First Amendment. Because of its maturity within the common law, defamation jurisprudence has, over time, largely found a way to co-exist with the demands placed on it by the freedom of speech. In reaching an accommodation consistent with freedom of speech, defamation has accumulated a considerable assortment of defenses, privileges, heightened burdens of proof, and particularized standards of review.

¶ 51 The concern that claims like false light invasion of privacy with close ties to defamation might be prosecuted free of the First Amendment safeguards present in defamation actions has drawn the attention of both the drafters of the Restatements and this court. This issue is taken up in a comment to section 652E of the Restatement, which notes:

> When the false publicity is also defamatory so that either action can be maintained by the plaintiff, it is arguable that limitations of long standing that have been found desirable for the action for defamation should not be successfully evaded by proceeding upon a different theory of later origin, in the development of which the attention of the courts has not been directed to the limitations.

Restatement (Second) of Torts § 652E, cmt. e (1977).

¶ 52 We responded to a similar concern when we held that Utah's statutory "fair report" privilege, nominally applicable to allegations of defamation, extended to a claim of intentional infliction of emotional distress tied to the same operative facts that gave rise to defamation claims brought by a nurse against a reporter and newspaper. *Russell,* 842 P.2d at 902–03. We underscored our holding with citations to cases that applied shorter statutes of limitation for defamation and libel to causes of action for intentional infliction of emotional distress and false light invasion of privacy that were tied to defamatory statements. *Id.* at 906 n. 37.

¶ 53 We are persuaded that the statute of limitations cases used in *Russell* to buttress the merits of applying the fair report privilege to a cause of action closely allied to defamation are equally persuasive for the actual propositions they advance: that the statute of limitations for defamation governs claims based on the same operative facts that would support a defamation action. In recognition of the possibility that a false light invasion of privacy claim may turn on operative facts that do not include defamation, we further limit our holding to the facts present here and extend the one-year limit to false light invasion claims that flow from allegedly defamatory statements.

¶ 54 Several additional considerations contribute to our conviction of the soundness of this holding. Because, as this case clearly attests, virtually any defamation claim may be recast as an action for false light invasion of privacy, were we to assign "catch-all" status to false light invasion of privacy we would effectively neuter the one-year defamation limitation. An express one-year statutory limitations period for defamation stands as the implied product of the legislature's consideration of the various policy considerations that inform the span of time appropriate to bring an action.

¶ 55 A shorter limitations period for defamation can be explained and justified as an acknowledgment of importance of the free speech interests with which defamation collides. A shorter defamation period reflects the importance placed on freedom of speech by restricting the time those making state-

---

matter concerning another that places the other before the *public* [i.e., more than one person] in a false light is subject to liability to the other for invasion of his privacy' " (quoting Restatement (Second) of Torts § 652E)).

ments are exposed to legal challenges, thereby reducing the chilling effect on speech that may accompany the prospect of defending statements well beyond their shelf lives. By encouraging persons aggrieved by allegedly defamatory statements to bring claims promptly, a shorter limitations period also increases the opportunities for defendants to take prompt and meaningful remedial steps to mitigate a plaintiff's damages by, for example, publishing retractions.

¶ 56 The characterization of section 78–12–25(3) as a "catch-all" carries with it the implication that none of the claims captured by it will have enjoyed the benefit of an individualized assessment of an appropriate statute of limitations. Therefore in light of strong affinity between defamation and Dr. Jensen's false light invasion of privacy claims based on defendants' defamatory statements, the assignment of those claims to the more fully reasoned statutory category is superior to casting the claim into the "catch-all" classification and disregarding all consequences of the substantial commonality of the claims.

¶ 57 We have not been asked to re-evaluate the status of false light invasion of privacy in the tort law of our state. Moreover, our discussion of the relationship between defamation and false light invasion of privacy should not be interpreted as an invitation to reconsider the viability of false light invasion of privacy. We remain sufficiently persuaded that there is certain unacceptable conduct that could be within the reach of false light invasion of privacy, but not defamation. Rather, our discussion bears on the narrow issue of whether the defamation statute of limitations should apply to claims of false light invasion of privacy.

¶ 58 We are cautious about describing in any detail the scope or contours of actions for false light invasion of privacy that do not involve allegations of defamatory statements. These are not relevant here. Dr. Jensen's false light invasion of privacy claims are tied to the same operative facts that grounded his defamation claims. Accordingly, we vacate the verdicts relating to false light invasion of privacy on the first and second broadcasts.

## II. THE TRIAL COURT DID NOT COMMIT PLAIN ERROR BY SUBMITTING THE FALSE LIGHT INVASION OF PRIVACY CLAIM ON THE THIRD BROADCAST TO THE JURY

¶ 59 Dr. Jensen's claim of false light invasion of privacy linked to the third broadcast, which aired November 6, 1996, was not vulnerable to a statute of limitations challenge. Defendants nevertheless challenge this portion of the jury verdict, asserting that the verdict was the product of the trial court's plain error.

¶ 60 According to defendants, the jury was improperly permitted to consider as actionable false light portrayals of activities that related exclusively to Dr. Jensen's professional life. Defendants assert that because only matters of a personal nature can form the basis for false light invasion of privacy, the depiction of Dr. Jensen's meeting with Ms. Sawyers could not have formed the basis for recovery under a false light theory. Defendants did not, however, offer a jury instruction on this point.

¶ 61 Utah Rule of Civil Procedure 51(d) bars appellate consideration of unpreserved defects in jury instructions "except to avoid manifest injustice." Utah R. Civ. P. 51(d). We have interpreted manifest injustice to be synonymous with plain error and that the same analytical model applies to each. *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991). The plain error test has three parts: the demonstration of error; a qualitative showing that the error was plain, manifest, or obvious to the trial court; and evidence that the error affected the substantial rights of a party. *State v. Casey*, 2003 UT 55, ¶¶ 42–50, 82 P.3d 1106.

¶ 62 We are not persuaded that the trial court erred when it did not include within the text of its instructions on the elements of false light invasion of privacy a statement that the disclosures made about Dr. Jensen in the broadcasts must have concerned his private affairs, as distinguished from his personal life. The instruction given by the trial court included a verbatim recitation of the elements of false light invasion of privacy as set out in section 652E of the Restatement.

Restatement (Second) of Torts § 652E (1977). Moreover, comment a to this section states:

> The form of invasion of privacy covered by the rule stated in this Section does not depend upon making public any facts concerning the private life of the individual. On the contrary, it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true.

*Id.* at cmt. a.

¶ 63 Inasmuch as we have endorsed the Restatement approach to invasion of privacy torts, *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 907 (Utah 1992); *Cox v. Hatch*, 761 P.2d 556, 563 (Utah 1988), the trial court would have acted contrary to this comment and likely committed error if it had instructed the jury that to recover for false light invasion of privacy, Dr. Jensen must show that the broadcast portrayed private information about him. Accordingly, we reject this challenge to the third broadcast.

## III. DEFENDANTS HAVE NOT ESTABLISHED GROUNDS TO DISTURB THE JURY'S VERDICT ON DR. JENSEN'S INTRUSION UPON SECLUSION CLAIM

¶ 64 Defendants next claim that the jury's verdict awarding Dr. Jensen damages for the intrusion upon seclusion species of invasion of privacy must be vacated. This common law claim is closely allied with Utah's statutory privacy protections that safeguard citizens against eavesdropping and communication abuse. Utah Code Ann. § 76–9–402 (2003). The jury found that defendants had violated section 76–9–402(1)(a) to (c) and awarded Dr. Jensen damages.[9] Defendants claim that the jury's verdict in favor of Dr. Jensen for the statutory claims must, like the verdict on the intrusion and seclusion claim, be reversed. We disagree.[10]

¶ 65 We begin our analysis of this portion of defendants' appeal by addressing a recurring theme: standard of review. The manner in which the parties have articulated the standard of review concerning this component of their appeal provides a useful framework to examine the standard of review issues implicated here, even though defendants reach the wrong conclusions about which standard should apply—an error of considerable consequence.

¶ 66 In their brief, defendants assert that "the district court erred when it denied summary judgment and submitted to the jury, and did not set aside the verdict on, Dr. Jensen's three alternative claims asserting an invasion of his privacy." By framing the issue in this way, defendants invite us to consider three separate occasions upon which the trial court had an opportunity, and in defendants' view the obligation, to dispose of Dr. Jensen's intrusion on seclusion tort claim and its statutory companions. By treating these events collectively, defendants imply that the same standard of review applies to each. According to defendants, that standard of review is a nondeferential de novo reconsideration of the record. Defendants do not attempt to explain why de novo review is uniformly applicable to a review of rulings on summary judgment, directed verdict, and the jury's verdict itself, nor do they cite any authority in support of this proposition.

¶ 67 It is beyond the scope of this appeal and not necessary to its outcome to note that different standards of review apply to appeals from rulings on motions for summary judgment, motions for a directed verdict, and motions for judgment notwithstanding the verdict. Nor need we do more than observe that appellate review of trial court denials of these motions are treated differently than review of motions granted. We likewise decline to take up the unbriefed question of whether it is appropriate to consider an appeal of a motion for a directed verdict that was improperly denied, thereby allowing a

---

9. Defendants argue in a footnote that it is impossible for United Television to be liable under section 76–9–402(1)(a) if Ms. Sawyers is not also liable. However, defendants fail to preserve or brief this issue, and therefore, we will not address it.

10. However, we agree that the trial court properly reduced the compensatory and punitive damages on the gathering of information claims. We therefore reject Dr. Jensen's cross-appeal seeking reinstatement of the damages.

matter of law to be submitted to a jury. *See, e.g., R.R. Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1515 (Fed.Cir.1984) (holding that it is "neither error nor dangerous to justice to submit legal issues to juries"); *Tights, Inc. v. Acme–McCrary Corp.,* 541 F.2d 1047, 1060 (4th Cir.1976) (holding that sending a matter of law to the jury was not error because it ultimately "involves underlying questions of fact" and because "the formulation of issues is a matter resting in the sound discretion of the trial court" (citations omitted)).

¶ 68 Defendants insist that we conduct a free-ranging review of the jury's verdict on these common law and statutory privacy claims because the jury was called upon to apply an objective standard in evaluating whether Dr. Jensen had a sufficiently cognizable privacy interest. Without a legitimate privacy interest, Dr. Jensen could not have established the first element of the tort of intrusion on seclusion, which requires that a defendant "intrude[ ] into a private place, or otherwise invade[ ] a private seclusion that the plaintiff has thrown about his person or affairs." Restatement (Second) of Torts § 652B, cmt. c (1977). The absence of a legitimate privacy interest would also be fatal to Dr. Jensen's statutory claims. Utah's privacy and communication abuse statute conditions actionable conduct on an invasion of a "private place" which is defined as "a place where one may reasonably be safe from casual or hostile intrusion or surveillance." Utah Code Ann. § 76–9–401(1).

¶ 69 Whether Dr. Jensen enjoyed an actionable privacy interest was to be evaluated objectively, measured by the expectation of a reasonable person. According to defendants, the jury's use of an objective standard to assess privacy exposes this verdict to more rigorous appellate scrutiny. We disagree.

¶ 70 The calculation of the proper measure of discretion to parcel out to a jury has virtually nothing to do with the fact that an objective standard is used to evaluate the presence or absence of a plaintiff's privacy interest. One need look no further than the law of negligence to confirm this point. Like the entitlement to privacy, the presence or absence of negligence is gauged objectively, measured by society's expectations for the behavior of the mythical "reasonable person." In our state, like virtually every other jurisdiction in our country, the question of whether a defendant's conduct fell below a particular standard of care is one to be decided by the jury. *See, e.g., Anderson v. Gribble,* 30 Utah 2d 68, 513 P.2d 432, 434 (1973) ("The rights and duties of drivers approaching intersections are questions dealing with the standard of conduct to be expected of a reasonably prudent man and are peculiarly a matter for the jury."); *Hone v. Mammoth Mining Co.,* 27 Utah 168, 75 P. 381, 384 (1904) (holding that questions of "ordinary care" are subject to different interpretations and are therefore appropriate matters for a jury).

¶ 71 Despite the fact that the application of objective legal standards has long been counted among the jury's tasks, defendants' assertion that an objective standard and non-deferential review are somehow connected is not farfetched. Indeed, the two concepts are linked to one another in a manner that becomes clear when they are viewed through the lens of the law versus fact standard of review assessment model. This model, which we explored in exacting detail in *State v. Pena,* 869 P.2d 932 (Utah 1994), is the source in our case law of the often invoked "pasture fence" metaphor. *See, e.g., State v. Brake,* 2004 UT 95, ¶ 13, 103 P.3d 699; *Alta Pac. Assocs. v. Utah State Tax Comm'n,* 931 P.2d 103, 109 (Utah 1997); *State v. Vincent,* 883 P.2d 278, 282 (Utah 1994).

¶ 72 In the bipolar law versus fact world, objective standards appear to display the attributes of legal constructs that are subject to unconstrained appellate review. It is not readily apparent, therefore, why a jury's application of an objective standard in its deliberations should mandate deferential appellate review.

¶ 73 Judge Learned Hand confronted this paradox when attempting to explain why the objectively evaluated question of negligence is submitted to the jury. He wrote: "[I]n cases tried to a jury it is indeed treated [as a question of fact], although obviously it is not a question of fact, for it measures the duty and liability which the law imposes." *Sidney*

*Blumenthal & Co. v. Atl. Coastline Rail Co.,* 139 F.2d 288, 290 (2d Cir.1943), *cert. denied,* 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084 (1944). The complicating truth at the heart of Judge Hand's observation is that even matters that would be traditionally understood as legal issues will be treated as questions of fact when presented to a jury.

¶ 74 To the extent that *Pena* describes a two-dimensional standard of review universe that can be navigated using the coordinates of law and fact, the treatment of objective standards in jury trials exposes its limitations. 869 P.2d at 939. Settling on a proper standard of review is about more than discriminating fact from law. Such a two-dimensional interpretation does not account for other important review considerations which lend breadth and depth to the review selection enterprise.

¶ 75 A comparison of *Pena* with this case illustrates the point. At issue in *Pena* was the proper standard by which to review a trial court's determination of whether a police stop was supported by reasonable suspicion. 869 P.2d at 934–35. The issue presented a classic mixed question of law and fact. *Id.* The circumstances surrounding Mr. Pena's detention were factual. *Id.* The concept of reasonable suspicion was legal. *Id.* The application of the reasonable suspicion standard to the circumstances of Mr. Pena's detention intertwined both elements. *Id.* at 936.

¶ 76 The focus of our inquiry in *Pena* was where to place the reasonable suspicion inquiry on the fact versus law continuum. *Id.* at 939. Here, however, we are reviewing a jury verdict. This enterprise does not lend itself to the task of measuring the ratio of law to fact, positioning the result along a linear scale, and applying the measure of discretion assigned to that particular point. Instead, a jury verdict, even a special verdict that incorporates a jury's answers to detailed components of a claim, will seldom lend itself to a *Pena*-like analysis because the variety of options for the application of discretion is not available when reviewing a jury verdict. Rather, once it is determined that a matter has been properly submitted to the jury, the question on review almost inevitably becomes the factual one of whether there was substantial evidence to support the outcome.

¶ 77 Defendants' argument is more accurately understood as a challenge to the sufficiency of the evidence. In other words, defendants contend that Dr. Jensen presented insufficient evidence—evidence that fell short of the substantial evidence standard necessary to support a jury verdict—to meet the proper legal standard for an environment into which an intrusion would be actionable. According to defendants, the uncontroverted facts established that the clinic was open to the public and that Dr. Jensen and Ms. Sawyers occupied the examination room in a professional, rather than private, capacity.

¶ 78 Defendants can certainly point to cases which have attempted to set up identifiable landmarks to mark the boundaries of a private environment which should be legally protected from intrusion. For example, subject to certain limitations, the work place enjoys lesser privacy protections than a dwelling. *See, e.g., Sanders v. Am. Broad. Co.,* 20 Cal.4th 907, 85 Cal.Rptr.2d 909, 978 P.2d 67, 74 (1999) (holding that "an employee may, under some circumstances, have a reasonable expectation of visual or aural privacy against electronic intrusion by a stranger, despite the possibility that the conversations and interactions at issue could be witnessed by coworkers or the employer"); *Dietemann v. Time, Inc.,* 284 F.Supp. 925, 926–31 (C.D.Cal.1968), *aff'd,* 449 F.2d 245 (9th Cir.1971) (The plaintiff was engaged in practicing simple quackery out of his home. Reporters from *Life Magazine* met with the plaintiff at his home and obtained pictures under the guise that they were referred to him by a friend. Instead the reporters worked with the Los Angeles District Attorney's office to get information about the plaintiff's practice and take pictures, which led to his arrest. The reporters also used a hidden radio transmitter to transmit the dialogue to a van. The pictures and a story about the plaintiff were subsequently published in *Life Magazine.* The Ninth Circuit held that this constituted an invasion of the plaintiff's privacy, writing, "It can hardly be concluded that plaintiff's activities in his house, whether in the presence of one or

several people, are activities in the public view for the purpose of publication.").. At the same time, as the *Sanders* court noted, the concept of privacy "is not a binary all or nothing characteristic." *Sanders,* 978 P.2d at 72.

 ¶ 79 We agree with the *Sanders* court that whether a person is entitled to solitude of seclusion is a relative and highly fact-dependent matter. The plastic nature of privacy is not at odds with the use of an objective standard to evaluate its existence. Rather, it is a recognition that reasonable people may find a legally protectable private environment in a multiple and varied array of physical settings.

¶ 80 We should be wary of using our appellate authority to attempt on a case-by-case basis to define with precision the boundaries of a reasonable sphere of protected privacy. Such an undertaking carries with it the risk of creating more problems than it would solve.

¶ 81 Justice Zimmerman, in *Pena,* recounted an example of the dangers of being overly eager to put too high a polish on fact-dependent legal doctrines, citing our experience with the law of waiver. 869 P.2d at 938. As Justice Zimmerman explained:

> In a series of earlier cases, we have ruled that waiver was or was not present as a matter of law on the specific facts of those cases. This entailed fairly close scrutiny of the application of the general stated waiver principles to particular fact situations. In the course of those decisions, we attempted to incorporate into the statement of the law of waiver those facts that led us to decide each of those cases as we did. Over time, we appear to have developed hopelessly inconsistent elaborations on the basic statement of waiver principles.

*Id.* (citation omitted).

¶ 82 Justice Zimmerman went on to note that this court worked its way out of this difficulty when it

> stripped the statement of the law back to its most basic form and told the trial courts to apply it. The net affect was to say that waiver is a highly fact-dependent question, one that we cannot properly re-

view de novo in every case because we cannot hope to work out a coherent statement of the law through a course of such decisions.

*Id.* (citation omitted).

¶ 83 We conclude that there is much to be learned from our experience with the law of waiver in approaching a legal definition of privacy. The jury instruction concerning privacy, to which defendants did not object, presented the jury with a definition of privacy in a basic form. Hewing closely to a general definition of privacy set out by our court of appeals in *Stien v. Marriott Ownership Resorts, Inc.,* 944 P.2d 374, 378 (Utah Ct.App.1997), the instruction stated:

> With respect to the first element, plaintiff must prove an intentional and substantial intrusion upon his solitude or seclusion.
>
> . . . .
>
> There are two forms of intrusion. The first form is an intrusion upon a person's physical solitude or seclusion. The second form does not require a physical intrusion, but does require a prying or intrusion into one's private affairs, such as eavesdropping on private conversations, peering into one's home through the windows, or opening and reading personal mail.

*Id.*

¶ 84 Defendants' failure to object to this instruction is reason enough to decline an extension or exploration of the contours of tort privacy. We would be unlikely to do so anyway in light of our belief that the facts to which a definition of actionable privacy would be applied are so complex and varying that no rule could be articulated that would anticipate all of them. *Pena,* 869 P.2d at 939.

¶ 85 Defendants have assumed a substantial risk by insisting that the jury verdict on the intrusion upon seclusion and statutory claims are subject to de novo review. That risk bears on yet another recurring theme in this appeal—marshaling. We have described this obligation as a defendant's burden to "ferret out a fatal flaw in the evidence" and become a "devil's advocate." *State v. Green,* 2005 UT 9, ¶ 28, 108 P.3d 710 (citations omitted).

¶ 86 Although we have not so expressly held, the rationale for the duty to marshal evidence has substantially less force in the context of de novo review. Where an appellate court is obligated to review the entire record anew, little is to be gained by requiring an appellant to play the role of devil's advocate and set up the opponent's case in its best light. Having unsuccessfully persuaded us to conduct a de novo review of this portion of the jury's adverse verdict, however, defendants are not excused from their obligation to marshal evidence.

¶ 87 Moreover, we decline to conduct a review based on a traditional challenge to the sufficiency of the evidence. We do so not only because defendants have failed to marshal the evidence, but because they have failed to preserve, through a challenge to jury instructions, the legal standard against which the jury tested its facts. Stated simply, we decline to conclude that it was unreasonable for the jury to determine that the falsely represented presence of Ms. Sawyers in Dr. Jensen's examination room deprived that environment of the privacy status it almost certainly held if Dr. Jensen were to have occupied the room alone.

¶ 88 We therefore affirm the jury's verdict on this issue.

## IV. DEFENDANTS FAILED TO MARSHAL THE EVIDENCE ON THEIR CLAIM THAT THE THIRD BROADCAST WAS SUBSTANTIALLY TRUE

¶ 89 Defendants challenge the jury verdict awarding Dr. Jensen damages on his defamation and false light invasion of privacy causes of action on the grounds that the content of the third broadcast was "substantially true." That statements which may be infected with inaccuracy, innuendo, and outright falsity and still not be actionable so long as their "gist" or "sting" rings true is but one of countless ways the law defers to the commanding presence of free expression among our liberties. Defendants concede that certain statements made in the third broadcast were not "literally" true. For example, Ms. Sawyers' use of the word "promise" to describe Dr. Jensen's commitment to prescribe Dexedrine for her was not uttered

when he said, "If Fastin didn't work for you, I'd be willing to work with you, uh, maybe using Dexedrine. It's technically not legal for that reason."

¶ 90 Once again, the selection of the appropriate standard of review is critical to the outcome of this issue. Citing United States Supreme Court cases as authority, defendants urge us to review the record de novo and to reach our independent judgment whether the content of the third broadcast was substantially true. We decline this invitation because it would require us to apply the wrong standard of review.

¶ 91 Appellate review of a jury verdict or bench ruling in which freedom of expression is at issue stands as an exception to traditional protection afforded jury verdicts from appellate review. That a ruling is found to involve "constitutional facts" and merit application of a "constitutional rule" is an indication that much is at stake. This is certainly true in the case of libel. A finding that a libelous statement was made with actual malice sufficient to permit recovery under *New York Times v. Sullivan*, 376 U.S. 254, 281–82, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is not reviewed with the same deference to the finder of that fact that would be extended to a finding of mens rea in other settings. Instead, where the First Amendment is implicated, the "actual malice" finding acquires the status of a "constitutional fact" requiring an appellate court to conduct an "independent examination of the whole record" to test its worthiness. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Harte–Hanks Communications Inc. v. Connaughton*, 491 U.S. 657, 685–90, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (extending the *Bose* ruling to jury trials).

¶ 92 The *Bose* Court reasoned that the assessment of whether a determination that a defamatory statement was animated by actual malice was one that intermingled fact with law—and not just any law, but one that implicates a "constitutional rule." 466 U.S. at 509, 104 S.Ct. 1949. A statement that earned the label of libelous thereby joined obscenity, fighting words, incitement to riot,

and child pornography as a category of unprotected speech banished from the protective embrace of the First Amendment. Because, however, the risk that any particular statement might be consigned to an unprotected category by a judge or jury insufficiently attentive to the First Amendment's broad protection of even offensive, caustic, and inaccurate statements, an appellate court is duty bound to act in its role as the guardian of constitutional protections to undertake searching appellate review of judgments affecting speech.

¶ 93 Justice Harlan aptly made this point when he noted in the context of obscenity:

The Court seems to assume that "obscenity" is a peculiar *genus* of "speech and press," *which is as distinct, recognizable, and classifiable as poison ivy is among* other plants. On this basis the *constitutional* question before us simply becomes, as the Court says, whether "obscenity," as an abstraction, is protected by the First and Fourteenth Amendments, and the question whether a *particular* book may be suppressed becomes a mere matter of classification, of "fact," to be entrusted to a factfinder and insulated from independent constitutional judgment. But surely the problem *cannot be solved in such a gener-*alized fashion. Every communication has an individuality and "value" of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an individual matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is [suppressible] within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as "obscene," for, if "obscenity" is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind.

*Roth v. United States,* 354 U.S. 476, 497–98, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (emphasis in original).

¶ 94 In *Bose,* the United States Supreme Court reasoned that although the determination of whether a defendant acted with the malice necessary to sustain a libel action displayed the hallmarks of a finding of fact, it nevertheless required the independent appellate review advocated by Justice Harlan.[11] 466 U.S. at 507 n. 25, 104 S.Ct. 1949.

¶ 95 Here, we are faced with the question of whether the review of substantial truth shares sufficient features with the review of actual malice so that it, too, must be treated as a constitutional fact and given more rigorous appellate scrutiny. We conclude that it does not.

¶ 96 Unlike actual malice, obscenity, and other "constitutional facts," the act of assessing whether an allegedly defamatory statement is substantially true does not require the finder of fact to apply a constitutional standard to a particular set of facts.[12]

---

11. Justice Stevens' majority opinion in *Bose* took care to note that the labor required to perform an independent examination of the record was less taxing than that required of a Court conducting de novo review. 466 U.S. at 492, 104 S.Ct. 1949. The independent examination contemplated by the *Bose* court was limited to the portions of the record relevant to the issue subject to independent review. Such a review was, in the view of the *Bose* majority, appreciably different from the review of the entire *judgment which is* the typical scope of work for a reviewing court conducting de novo review. *Id.* at 514 n. 31, 104 S.Ct. 1949. The *Bose* dissenters were apparently unimpressed with this distinction. They uniformly described the undertaking required by the majority as de novo review. *Id.*

12. This is not to say that the defense of substantial truth has no constitutional dimension. A definition of defamation that would expose a person to liability for any statement that fell short of absolute, literal truth would likely violate the First Amendment. *New York Times,* 376 U.S. at 289, 84 S.Ct. 710; *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 508–11, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

The task of gauging the overall thrust of an allegedly defamatory statement against the accuracy of its component parts is not one that demands the exercise of constitutional judgment. Instead, determining whether an allegedly defamatory statement is substantially true calls upon finders of fact to engage in the work for which they are best suited, the discovery of truth through the application of their judgment, life experience, and common sense. Therefore, we review the issue of whether defendants' statements were substantially true as a traditional question of fact. We will set aside the jury verdict, which was based in part on the finding that defendants' statements were not substantially true only if there exists no substantial evidence to support it.[13]

¶ 97 As a consequence of our holding that the defense of substantial truth presents a question of fact, defendants assume the obligation to marshal evidence.

¶ 98 Defendants have failed to satisfy their duty to marshal. The approach taken by defendants on the issue of substantial truth in their reply brief highlights this shortcoming. The section of their brief addressing substantial truth is titled "Dr. Jensen has failed to demonstrate that the defendants' published statements are not substantially true." Not only does this statement suggest incorrectly that the burden to prove this defense fell to Dr. Jensen, but it also conveys the erroneous notion that Dr. Jensen had the duty to present evidence from the record sufficient to carry his burden on appeal. Neither proposition is true. We conclude that in the absence of any meaningful marshaling, defendants have forfeited a claim to our substantial evidence review of the defense of substantial truth.

## V. ECONOMIC DAMAGES FLOWING FROM THE THIRD BROADCAST

¶ 99 Defendants argue that the evidence is insufficient to support the jury's $1 million damages award to Dr. Jensen for economic losses caused by the third broadcast. They insist that the award was error because Dr. Jensen proffered no evidence that he suffered any economic loss that could be linked to the third broadcast. All evidence relating to any economic loss, most significantly evidence that Dr. Jensen was stripped of his medical privileges and suffered a reduction in work hours, concerned events that took place more than a year before the third broadcast. We again begin our assessment of this issue by setting out the standard of review and proof needed to sustain a jury verdict for damages.

¶ 100 We will disturb a jury verdict challenged for lack of evidence only if we conclude that the quantity and quality of the evidence fall short of "substantial." Where evidence may be susceptible to multiple interpretations, some tending to support the verdict, others pointing to an ill-advised result, we will indulge only those reasonable inferences favorable to the verdict. *Water Energy Sys. Tech., Inc. v. Keil,* 2002 UT 32, ¶¶ 2, 15, 48 P.3d 888.

¶ 101 On this issue, defendants yet again display a less than zealous commitment to the duty to marshal evidence. Defendants attempt to justify sidestepping the marshaling requirement by insisting that there is no evidence on the record to marshal. This tactic of marshaling avoidance is fraught with peril. In most instances, this ploy amounts to nothing more than an attempt to shift the burden of satisfying the sufficiency test to the appellee in a format that postpones any meaningful engagement of the sufficiency issue to the appellees' brief. This turns marshaling on its head.

¶ 102 At the conclusion of every lawsuit that has survived trial and post-trial motions, the winning party, the trial judge, and the jury had reason to believe that there was some evidence presented to validate the outcome. In bench trials, this evidence is reflected in the court's findings of fact. In jury trials, it can be expected to be highlighted in closing arguments and in arguments offered

---

13. Defendants also claim that we should evaluate the issue of substantial truth for correctness because they raised the issues in motions for summary judgment and for judgment notwithstanding the verdict. Defendants have not briefed these novel contentions, and we decline, in the absence of analysis, to consider them.

in opposition to directed verdicts and post-trial motions. Usually advocates can be counted on to put their best facts on display in these settings. They therefore offer reliable resources to parties who face a marshaling burden on appeal.

¶ 103 Our commitment to the marshaling requirement is unyielding. Moreover, we disapprove of attempts to evade the responsibility to marshal. These expressions of resolve notwithstanding, we agree with defendants that the record contains no discernible evidence linking economic loss to the third broadcast.

¶ 104 This is not to say that the record is devoid of evidence that any of the broadcasts had negative economic effects for Dr. Jensen. It is not. But the jury was asked to separately address economic loss traceable to the third broadcast, and it is this evidence that cannot be accounted for. Indeed we are unable to uncover, even in the likely locations identified above, any credible assignment of economic loss to the third broadcast.

¶ 105 In reaching this conclusion, we paid particular attention to the testimony of Dr. Jensen and Mr. Frank Stuart, Dr. Jensen's expert witness on economic damages. We canvassed Dr. Jensen's responses to defendants' motions for directed verdict, judgment notwithstanding the verdict, a new trial, and to alter or amend the judgment. We examined the closing arguments of all parties. We inspected Dr. Jensen's exhibits graphing his income trends. None of these quests yielded evidence of economic loss tied to the third broadcast.

¶ 106 We will describe our review of the record more fully.

### A. Plaintiff's Responses to Defendants' Motions

¶ 107 Dr. Jensen met defendants' motions challenging the adequacy of his economic loss evidence related to the third broadcast by noting that "Dr. Jensen testified at length regarding the patients who refused to see him, lost hospital privileges, and the cut in his hours which resulted in his need to leave the Art City Medical Clinic in search of work elsewhere, namely nursing homes," and "[t]hese damages occurred after the November broadcast." He argued that as a result of the third broadcast, "now he works in nursing homes billing Medicare and Medicaid, working longer hours, and being confronted with death everyday." However, the record does not support these assertions. Instead, the testimony cited by Dr. Jensen's counsel fails to link these economic events to the third broadcast. Moreover in his response to defendants' motion for a judgment notwithstanding the verdict, Dr. Jensen argues that "Media Defendants misstate that Dr. Jensen's entire damage theory was based on his removal from IHC physicians' panel." Yet nowhere in this motion does Dr. Jensen demonstrate any tie between the third broadcast and economic damages.

¶ 108 Dr. Jensen also contends that economic losses were limited to the third broadcast through the testimony of Mr. Stuart that "because Dr. Jensen was forced into nursing home practice, he is currently making less money than he would have been making if he were still in private practice." Yet Dr. Jensen likened his move from private practice to nursing homes to his loss of IHC privileges after the first broadcast. It is true that Dr. Jensen left his position at the Art City Clinic after the third broadcast. However, he was not terminated from that position. Instead, when his hours were decreased at the clinic—possibly as a result of the third broadcast—Dr. Jensen voluntarily left the clinic and sought work in the nursing home field.

### B. Plaintiff's Testimony and Exhibits

¶ 109 Dr. Jensen admitted that the greatest blow to his income was caused by loss of IHC privileges a year before the third story aired. On appeal, Dr. Jensen attempts to redirect the source of his economic misfortune to the third broadcast. Dr. Jensen argues that the third broadcast made inevitable his termination from the Art City Clinic. Seeing his involuntary separation from the clinic coming, Dr. Jensen resigned to take a less desirable and lower paying nursing home practice.

¶ 110 However, the record does not support Dr. Jensen's perceived attempt to link his demotion to nursing home practice to the

third broadcast. The record shows that Dr. Jensen was told after the third broadcast that if *another story* aired he *could* be fired from the Art City Clinic.

¶ 111 Tellingly, Dr. Jensen's exhibits do not reflect economic damage from leaving Art City and moving to nursing home work. According to his exhibits, Dr. Jensen made $127,606 in 1996, the year of the third broadcast. His income increased by sixty-three dollars in 1997. His exhibits also graph a forty-thousand dollar increase in revenue between 1996 and 1999.

¶ 112 Accordingly, plaintiff's testimony and exhibits do not offer substantial evidence to support the $1 million verdict for economic loss related to the third broadcast.

### C. Dr. Jensen's Closing Argument

¶ 113 We next turn our attention to yet another resource which could reasonably be counted on to provide clues about the evidentiary basis for Dr. Jensen's claim of economic loss, his closing argument to the jury. Our review of the closing arguments uncovered no reference to evidence that might support a finding of damages for the third broadcast. Instead, Dr. Jensen's counsel argued that "as a result of the [first] newscast Dr. Jensen was fired from FirstMed," causing Dr. Jensen damage. Counsel also told the jury that as a result of the first broadcast Dr. Jensen no longer had IHC privileges. Counsel then stated that his experts demonstrated a "substantial drop in gross income during 1995" and that it takes more work to earn the same amount of money in nursing homes, but he articulates no link anywhere between the third broadcast and the damage. This is because all the experts and damage figures relate to Dr. Jensen's removal from the IHC panel, which took place in 1995. No figures were tied directly to the third broadcast, which is the only broadcast we review. The record confirms this characterization of the evidence.

### D. Dr. Jensen's Argument on Appeal

¶ 114 On appeal, Dr. Jensen mounts a three-pronged attack in support of the jury's economic damages attributed to the third broadcast. He first argues that we cannot disturb the findings of the jury because this court must defer to a jury's findings. He also insists that because the trial court denied motions for new trial or reduction or vacation of the award, this represents "further solidarity of the judgment." We disagree. As explained earlier, our jurisprudence gives appellate courts the right to vacate a jury verdict for insufficient evidence if, upon review, we are unable to identify substantial evidence in support of the finding. As we have detailed, that is the case here.

¶ 115 Second, Dr. Jensen argues that defendants failed to marshal the evidence and merely pay "lip service to this obligation." As we addressed above, we reject this attempt to transfer the burden to defendants, which cannot be met because there is, in fact, no discrete evidence to support an award of damages on the third broadcast.

¶ 116 Finally, Dr. Jensen acknowledges that "in presenting damage calculations at trial, [his] experts did not compartmentalize the damages by broadcast." He argues this was not necessary because the jury heard the evidence and apportioning the awards by broadcast was properly left to the discretion of the jury. The structure of the jury verdict undercuts this assertion. The jury was presented with a separate verdict form concerning economic damages attributable to the third broadcast. Its award must be supported by substantial evidence that meets the requirements of the verdict. The record does not contain that evidence. Therefore, we vacate the award.

### VI. AN INDEPENDENT REVIEW OF THE RECORD DOES NOT SUPPORT AN AWARD OF PUNITIVE DAMAGES FOR ACTUAL MALICE IN THE THIRD BROADCAST

¶ 117 The last issue defendants ask us to review is their contention that the jury erred in awarding Dr. Jensen punitive damages on the defamation and false light claims relating to the third broadcast. Defendants argue that there was not clear and convincing evidence of actual malice and, therefore, punitive damages were improperly awarded. In spite of our impression that the third broad-

cast was likely the least defensible of the three, we conclude that its content does not reveal actual malice and therefore vacate the award of punitive damages.

¶ 118 In reaching this conclusion, we conduct a nondeferential independent review of the record. *Bose Corp. v. Consumers Union,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Although *Bose* did not concern a challenge to punitive damages, this distinction does not distort the suitability of its fit to this case. At the core of both cases is the question of the proper standard of review to be applied to outcomes based on findings of actual malice concerning statements that enjoyed a colorable claim to First Amendment protection. We therefore follow the prescription for independent review of the record that the content of the third broadcast was made by defendants with "actual malice." *Id.* at 498–502, 104 S.Ct. 1949.

¶ 119 Statements of actual malice are those made "with knowledge that [they] were false or [made] with reckless disregard of whether [they] were false or not." *Id.*

### A. The Third Broadcast

¶ 120 In the third broadcast, Ms. Sawyers targeted "questionable doctors" such as those who were "passing out drugs to addicts or worse yet, sexually abusing ... patients." She told viewers they could find out which "questionable doctors" were practicing medicine in Utah by reading a Washington watchdog publication, "Questionable Doctors." As part of this report, she asked viewers, "And what about Dr. Michael Jensen? In July 1995 we caught him on camera promising me illegal drugs for weight loss." The report then showed Dr. Jensen telling Ms. Sawyers that "[i]f Fastin didn't work for you, I'd be willing to work with you, uh, maybe using Dexedrine. It's technically not legal for that reason." Ms. Sawyers then informed viewers that "[t]he State filed an action against Jensen last June. But again, the case is in the hands of lawyers and Dr. Jensen is still practicing." She provided a "postscript" to viewers, telling them that

[y]esterday we got word that action has now been taken against Dr. Michael Jensen. He's the one we caught on tape promising me illegal drugs. The state will allow Jensen to keep his license but he'll receive a public reprimand which requires him to attend a workshop on proper prescribing and a course on medical ethics.

### B. Application of the Actual Malice Standard to the Third Broadcast

¶ 121 The centerpiece of Dr. Jensen's claim of actual malice is Ms. Sawyers' statement that he "promised" her illegal drugs. There is no doubt that Dr. Jensen offered to "work with her" in illegally prescribing Dexedrine to her, but this, as we have stated earlier, may not constitute a promise. Defendants concede the literal inaccuracy of the word "promise." This misstatement connotes a more unequivocal willingness by Dr. Jensen to flout the law governing prescription medicine. It does not, however, leave us with the clear and convincing impression that the accusatory distinction between "promise" and "work with" is sufficient to establish actual malice. It surely falls short of indicating personal malice rising to the level of hatred or ill-will on the part of defendants against Dr. Jensen.

¶ 122 Our independent review of the testimony by Ms. Sawyers and station manager John Edwards persuades us that there is insufficient evidence from which we could conclude they did not hold an honest belief that Dr. Jensen had offered or promised her Dexedrine, which is illegal for use in weight loss. The interaction between Ms. Sawyers and Dr. Jensen does square with the *Black's Law Dictionary* definition of promise—"The manifestation of an intention to act or refrain from acting in a specified manner that another is justified in understanding that a commitment has been made...." *Black's Law Dictionary* 1229 (7th ed.1999). It is clear that Dr. Jensen manifested an intent or willingness to act in a specific manner—to prescribe Dexedrine—although it was not legal for weight loss purposes. Ms. Sawyers testified that she believed the content of the third broadcast accurate or truthful because Dr. Jensen had twice offered her Dexedrine and she had confirmed with DOPL that prescrib-

ing it was illegal. Mr. Edwards testified similarly. Thus even her most egregious misstatement does not rise to the level of actual malice.

¶ 123 We do find the general tenor of the third broadcast troubling. By aggregating within a broadcast the alleged misdeeds of several physicians, the third broadcast had the presumably intended effect of shifting focus from the misconduct and disciplinary fate of individual physicians to a more sensational suggestion that Utah was home to a band of rogue doctors imperiling the health of its citizens. This inference of a potentially malicious motive for the third broadcast enjoys, however, no greater claim to credibility than does Ms. Sawyers' explanation that the purpose of the third broadcast was not to compare physicians and their offenses, but to educate the viewers on how to research physicians who might be under investigation.

¶ 124 The third broadcast focused on Utah physicians either in the "Questionable Doctors" book or, as in the case of Dr. Jensen, a physician whose conduct fell under the rubric of questionable. Her focus in the third broadcast was to "let the public know about how they could find out about pending actions or actions that had already been taken against physicians in this state." Ms. Sawyers acknowledged that she did not believe that Dr. Jensen's conduct was as bad as the other physician she identified in the story, nor was he, at that time in "Questionable Doctors." She explained that her reason for including him in the broadcast was that "[Dr. Jensen] was an example of a doctor who had been investigated by the Division of Professional Licensing." Investigations by DOPL into physician conduct form the basis and content for editions of the book "Questionable Doctors." Ms. Sawyers added that even if she had learned of the resolution of the DOPL charges against Dr. Jensen, she still "would have said he is the one we caught on camera offering me illegal drugs" because she believed this to be true. She also testified that the process of editing and preparing the third broadcast was a time-intensive and highly evaluative process which, she insists supports her position that the content of the broadcast and her conduct were not, nor

would have been, made with knowledge that the broadcast was untruthful.

¶ 125 While clearly an aberration from "fair and balanced" journalism, the content of the third broadcast leaves us unconvinced that it was the product of actual malice. We therefore vacate the award of punitive damages on the third broadcast.

## VII. DR. JENSEN'S CROSS-APPEAL

¶ 126 Dr. Jensen cross-appeals on the issue of fees. He argues that the trial court should have awarded him fees because his work on the claims substantially overlapped, because he did sufficiently allocate the fees between recoverable and nonrecoverable fees, and because Ms. Sawyers did not comply with rule 54(d)(2). He also appeals the trial court's reduction of damages because the awards were based on duplicative claims. We affirm.

### A. Standard of Review

¶ 127 Attorney fees are awarded only when authorized by statute or by contract. The award of attorney fees is a matter of law, which we review for correctness. *Paul DeGroot Bldg. Servs., L.L.C. v. Gallacher,* 2005 UT 20, ¶ 18, 112 P.3d 490. However, a trial court has "broad discretion in determining what constitutes a reasonable fee, and we will consider that determination against an abuse-of-discretion standard." *Dixie State Bank v. Bracken,* 764 P.2d 985, 991 (Utah 1988) (internal quotation marks and citations omitted). "The standard of review on appeal of [the amount of] a trial court's award of attorney fees is patent error or clear abuse of discretion." *Valcarce v. Fitzgerald,* 961 P.2d 305, 316 (Utah 1998) (internal quotation marks and citations omitted).

### B. Attorney Fees on Overlapping Claims

¶ 128 We first address whether the trial court erred by not awarding attorney fees on the overlapping claims. In general, a prevailing party may collect attorney fees on noncompensable claims only if those claims substantially overlap with compensable claims. *Keith Jorgensen's, Inc. v. Ogden*

*City Mall Co.,* 2001 UT App 128, ¶ 30, 26 P.3d 872.

¶ 129 The trial court properly concluded that Dr. Jensen was not entitled to all attorney fees because

> some of plaintiff's claims are based on the obtaining of information, and other claims are based on the broadcast of information, there is not a core of facts common to all claims, and the legal theories are unrelated. In this case, not only was some of the time spent on unsuccessful issues, a large portion of time was spent establishing the non-compensable claims of defamation and false light.

¶ 130 On appeal, Dr. Jensen's counsel merely argues that "[a]lthough Dr. Jensen's claims can loosely be categorized as gathering of information claims and broadcast claims, that does not mean that the claims do not overlap." Not only is this argument conclusory, it fails to convince us, or provide us sufficient evidence, to overcome the applicable standard of review. Moreover, we agree with the trial court that the invasion of privacy claims based on newsgathering are not "inextricably linked" with, and require different proof than, the defamation and false light claims based on the broadcasts. We therefore defer to the trial court's evaluation of the evidence and documentation submitted on the overlapping claims, and affirm.

### C. Attorney Fees Due to Defective Allocation Documentation

¶ 131 The second issue on cross-appeal—the issue of attorney fees for compensable and noncompensable claims—was meticulously addressed in two of the trial court's rulings. In July 2001, the court notified Dr. Jensen that his claims had failed to adequately apportion between compensable (i.e., Title 76 and common law intrusion upon seclusion claims), and noncompensable claims. The court invited plaintiff's counsel to supplement their affidavits by separating out the work into three categories: (1) work that pertains specifically to Utah Code Ann. §§ 76–9–401 to –406; (2) work that specifically pertains to common law intrusion upon seclusion; and (3) work on any other claim. With regard to fees of mixed character, plaintiff was to break out (1) what percentage of each billing entry went to support common law intrusion upon seclusion claims, and (2) what percentage went to support Title 76 claims. All other work was deemed to have been done on noncompensable claims. The court stated that failure to adequately separate noncompensable and compensable claims may result in denial of any other fees for the commingled entry.

¶ 132 In the trial court's second ruling on this matter, it correctly explained that for it to award attorney fees, it must first review all the evidence and make specific findings of fact. Further, the party requesting the attorney fees must

> categorize the time and fees expended for "(1) successful claims for which there may be an entitlement to attorney fees, (2) unsuccessful claims for which there may be an entitlement to attorney fees had the claims been successful, and (3) claims for which there is no entitlement to attorney fees."

*Foote v. Clark,* 962 P.2d 52, 54 (Utah 1998) (quoting *Cottonwood Mall Co. v. Sine,* 830 P.2d 266, 268 (Utah 1992)). Noncompliance with these requirements makes it difficult, if not impossible, for the trial court to award the moving party fees because there is insufficient evidence to support the award.

¶ 133 The trial court noted the extensive work and research conducted in preparation for this case. The court also acknowledged that the attorneys' affidavits did reflect the amount of work necessary to mount the case. The court found that Attorney Gardiner adequately, but not exactly, complied with the attorney fees documenting his time spent on compensable claims. However, Attorney Sine did not. Mr. Sine told the court it was "impossible" for him to separate his time and merely separated the time into two columns—one compensable and the other noncompensable. As a result, the trial court found it had previously warned counsel in the July order of the importance of adequate separation of the claims, yet again "Mr. Sine did not give [the court] sufficient evidence to determine how much time he spent on compensable claims and because the amount of

time he claimed to have spent on the compensable claims is unreasonable, this [c]ourt cannot make an appropriate evaluation."

¶ 134 Mr. Sine presents one sentence for our consideration of his argument on appeal. He writes: "If the court closely examines Attorney Sine's submissions, it will see the criteria for fees was met." This is inadequate and does not provide sufficient legal reason for us to override the discretion of the trial court which had the ability to twice review the documentation on this issue. Affirmed.

### D. Dr. Jensen's Application for Award of All Claimed Costs

1. Ms. Sawyers complied with rule 54(d)(2)

¶ 135 Dr. Jensen also argues that all of his claimed costs should have been awarded because Ms. Sawyers failed to comply with rule 54(d)(2) of the Utah Rules of Civil Procedure. Rule 54(d)(2) states:

> The party who claims his costs must within five days after the entry of the judgment serve upon the adverse party against whom costs are claimed, a copy of a memorandum of the items of his costs and necessary disbursements in the action, and file with the court a like memorandum thereof duly verified stating that to affiant's knowledge the items are correct, and that the disbursements have been necessarily incurred in the action or proceeding. A party dissatisfied with the costs claimed may, within seven days after service of the memorandum of costs, file a motion to have the bill of costs taxed by the court.
>
> A memorandum of costs served and filed after the verdict, or at the time of or subsequent to the service and filing of the finding of fact and conclusions of law, but before the entry of judgment, shall nevertheless be considered as served and filed on the date judgment is entered.

Utah R. Civ. P. 54(d)(2).

■ ¶ 136 The sum total of Dr. Jensen's argument is that his timely filed motion of dissatisfaction with the court seeking costs in the amount of $122,952.66 should have been granted because Ms. Sawyers filed an objection, rather than a motion, opposing those costs. He cites no authority for support.

¶ 137 Ms. Sawyers contends that the words "motion" and "objection" are interchangeable and therefore she properly complied with rule 54(d)(2). For support, she cites two rule 54(d)(2) cases, *Graco Fishing & Rental Tools v. Ironwood Exploration, Inc.*, 766 P.2d 1074, 1080 (Utah 1988), and *Suniland Corp. v. Radcliffe*, 576 P.2d 847, 849 (Utah 1978), which specifically identify the filing of an "objection" rather than a "motion" to convey the dissatisfaction with the proposed distribution of cost awards.

¶ 138 We agree with Ms. Sawyers that motion and objection are interchangeable in this case. *Black's Law Dictionary* defines a motion as a "written or oral application requesting a court to make a specified ruling or order." 1031 (7th ed.1999). An objection is defined as a "formal statement opposing something that has occurred, or is about to occur, in court." *Id.* at 1101. In this case, having reviewed Ms. Sawyers' objection to the memorandum of verified costs which follows the same framework as a motion, we conclude that the distinction Dr. Jensen asks us to make is too narrow and violates the intent and spirit of rule 54(d)(2). We affirm the trial court's finding that Ms. Sawyers complied sufficiently with rule 54(d)(2).

2. Dr. Jensen's claimed costs were not "Necessary Disbursements"

■ ¶ 139 Dr. Jensen appeals the trial court's denial of his application for costs for "necessary disbursements" authorized under rule 54(d)(2) and associated with his claim for transcript costs, expert witness fees, court equipment expenses, and other out-of-pocket costs. Dr. Jensen claims that the trial court erred by too strictly applying the rule we set out in *Frampton v. Wilson*, 605 P.2d 771, 774 (Utah 1980). The trial court supported its position by writing that "the Utah Supreme Court has stated that 'there is a distinction to be understood' between legitimate and taxable costs and other expenses of litigation which may ever be so necessary, but are not taxable as costs" (citing *Frampton*, 605 P.2d at 774). Dr. Jensen argues that we should reverse or modify the *Frampton* rule be-

cause rule 54(d)(2) does not distinguish between taxable costs and litigation expenses and because the *Frampton* rule omits the "necessary disbursements" language in rule 54(d)(2). We disagree.

¶ 140 We again reference the appropriate standard of review for costs under rule 54(d)(2). "A trial court's decision to award the prevailing party its costs will be reviewed under an abuse of discretion standard." *Young v. State*, 2000 UT 91, ¶ 4, 16 P.3d 549. Moreover, in *Frampton* we instructed that the trial court has a "duty to guard against excesses or abuses" in awarding costs. 605 P.2d at 773.

¶ 141 The trial court's order on this issue carefully reviewed this court's body of law on necessary disbursements and costs. The court makes clear that many of Dr. Jensen's proposed costs violate the *Frampton* rule against unnecessary costs. Specifically, the court found that some of the deposition costs were not essential or Dr. Jensen could not demonstrate that a less expensive means of obtaining the transcripts would not have been practical.[14] The court reminded the parties that "[c]osts were not recoverable at common law; and are therefore generally allowable only in the amounts and in the manner provided by statute." *Frampton*, 605 P.2d at 773. As a result, a number of items were held unrecoverable by statute—those included a video consultant and court equipment expenses.

¶ 142 Dr. Jensen tries to make a case for rejecting *Frampton*, arguing that the question of necessary costs should not be left entirely to the discretion of the legislature and because it may violate the open courts clause in the Utah Constitution by limiting "recoverable costs to those conservatively specified by the legislature." We disagree. For twenty-five years, *Frampton* has remained our guiding principle for allocation of recoverable costs. The trial court properly applied *Frampton* to the issue of recoverable costs. Dr. Jensen has failed to persuade us with sufficient authority or evidence that we should overrule *Frampton* and reject the guidelines established by the legislature for appropriate recoverable costs. We therefore affirm.

## CONCLUSION

¶ 143 Having held that Dr. Jensen's false light invasion of privacy claims arising from the first and second broadcasts are subject to the statute of limitations governing defamation and therefore time-barred, we vacate the verdict and damages awards based on that claim. Our holding that the jury improperly awarded economic loss and punitive damages to Dr. Jensen on his claims relating to the third broadcast results in the modification of the damages award to $500,000 subject to apportionment based on the jury's allocation of fault.

¶ 144 Having affirmed the trial court on all other issues raised on appeal, the remaining elements of the judgment are undisturbed.

¶ 145 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.

---

14. In *Young,* we determined that a successful plaintiff seeking costs must show "the deposition was so essential to the case ... that the information provided by the deposition could not have been obtained through less expensive means of discovery." 2000 UT 91, ¶ 11, 16 P.3d 549.